IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| _____ ) | |
| HYUNDAI MOTOR AMERICA, INC. and ) | |
| HYUNDAI MOTOR COMPANY, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil Action No. 3:17-cv-732 |
| vs. ) | |
| ) | **JURY TRIAL DEMANDED** |
| DIRECT TECHNOLOGIES ) | |
| INTERNATIONAL, INC. d/b/a DTI, INC., ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**DEFENDANT DIRECT TECHNOLOGIES INTERNATIONAL, INC.'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS FOR
FAILURE TO STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED
PURSUANT TO FED. R. CIV. P. 12(b)(6)**

Defendant Direct Technologies International, Inc. ("DTI") respectfully submits this

Memorandum of Law in Support of its Motion to Dismiss for Failure to State a Claim on Which

Relief can be Granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

Plaintiffs Hyundai Motor America, Inc. ("Hyundai USA") and Hyundai Motor

Company's ("Hyundai International") (collectively, "Hyundai") Complaint [DE 1] (the

"Complaint") alleges that DTI purchased Hyundai branded parts abroad, imported the Hyundai

branded parts into the United States, and then resold the Hyundai branded parts in the United

States. That is, Hyundai is alleging that DTI is selling so-called "gray market" auto parts.

Unfortunately for Hyundai, the United States Supreme Court as well as numerous circuit courts

have had quite a bit to say about importation of goods after a first sale abroad and, specifically,

about importation of gray market goods. Indeed, Supreme Court authority controls this case and

requires that the Complaint be dismissed because DTI's conduct, as alleged in the Complaint, is *per se* legal.

## I. GRAY MARKET GOODS

In the Complaint, Hyundai uses the term "grey market" at least 20 times. It is true that DTI legally purchases auto parts abroad and legally resells those auto parts in the United States. Therefore, the key to understanding the allegations in the Complaint is understanding what gray market products are and what they are not. To do so, this Court need look no further than the Supreme Court, which has repeatedly discussed instances where the first sale of a good, protected by intellectual property, occurs abroad, prior to importation into the US.

The Supreme Court has defined a gray market good as "a foreign-manufactured good, bearing a valid United States trademark, that is imported without the consent of the United States trademark holder." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 285 (1988). For trademark purposes, the Supreme Court has identified three different "general contexts" in which gray market issues arise:

> [**Case 1** occurs where] a domestic firm that purchases from an independent foreign firm the rights to register and use the latter's trademark as a United States trademark and to sell its foreign-manufactured products here. …
>
> [**Case 2** occurs where] a domestic firm registers the United States trademark for goods that are manufactured abroad by an affiliated manufacturer. In its most common variation (case 2a), a foreign firm wishes to control distribution of its wares in this country by incorporating a subsidiary here. The subsidiary then registers under its own name (or the manufacturer assigns to the subsidiary's name) a United States trademark that is identical to its parent's foreign trademark. The parallel importation by a third party who buys the goods abroad (or conceivably even by the affiliated foreign manufacturer itself) creates a gray market. [discussion of cases 2b and 2c omitted]. ….
>
> [**Case 3** occurs where] the domestic holder of a United States trademark *authorizes* an independent foreign manufacturer to use it. Usually the holder sells to the foreign manufacturer an exclusive right to use the trademark in a particular

foreign location, but conditions the right on the foreign manufacturer's promise
not to import its trademarked goods into the United States….

*Id.* at 286. The opinion of the Court in *K Mart* was fractured with respect to Cases 2b, Case 2c, and Case 3. However, "All Members of the Court…agree[d]that the agency [Customs] may interpret the statute…to permit the imports under case 2a." *Id.* at 292. Justice Brennan explained the Court's unanimous decision and the policy underpinning the decision as follows:

> In contrast [to Case 1], if the gray market harms a United States trademark holder in case 2a … that firm and its foreign affiliate (whether a parent, subsidiary, or division) can respond with a panoply of options that are unavailable to the independent purchaser of a foreign trademark. They could, for example, jointly decide in their mutual best interests that the manufacturer (1) should not import directly to any domestic purchaser other than its affiliate; (2) should, if legal, impose a restriction against resale (or against resale in the United States) as a condition on its sales abroad to potential parallel importers; or (3) should curtail sales abroad entirely.

> These differences furnish perfectly rational reasons that Congress might have intended to distinguish between a domestic firm that purchases trademark rights from an independent foreign firm and one that either acquires identical rights from an affiliated foreign firm or develops identical rights and permits a manufacturing subsidiary or division to use them abroad.

*Id.* at 302. Thus, a key factor for Justice Brennan was the fact that a foreign parent corporation had the ability to control how the mark was applied to the goods in the first instance.

In full accord with *K Mart*, US Customs regulations **continue to permit the importation of gray market goods** falling in "case 2a."[1] Furthermore, the Supreme Court's *K Mart* decision is in full accord with Centuries old trademark law. Justice Holmes long ago observed:

> A trade-mark only gives the right to prohibit the use of it so far as to protect the owner's good will against the sale of another's product as his.… When the mark

---

[1] *See* 19 C.F.R. § 133.23 (d) Relief from detention of gray market articles. Importer may not have goods detained where "(1) The trademark or trade name was applied under the authority of a foreign trademark or trade name owner who is the same as the U.S. owner, a parent or subsidiary of the U.S. owner, or a party otherwise subject to common ownership or control with the U.S. owner…."

is used in a way that does not deceive the public we see no such sanctity in the word as to prevent its being used to tell the truth. It is not taboo.

*Prestonettes, Inc., v. Coty*, 264 U.S. 359, 368 (1924) (internal citations omitted).[2] The Circuit Courts have consistently applied this Supreme Court authority. The Ninth Circuit has explained that:

> Since 1924, courts have recognized a basic limitation on the right of a trademark owner under the Lanham Act to control the distribution of its own products. Beginning with *Prestonettes, Inc. v. Coty*, 264 U.S. 359 (1924), courts have consistently held that, with certain well-defined exceptions, the right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product. Resale by the first purchaser of the original article under the producer's trademark is neither trademark infringement nor unfair competition.
> ***
> When a purchaser resells a trademarked article under the producer's trademark, and nothing more, there is no actionable misrepresentation under the statute.

*Sebastian Intern., Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1074, 1076 (9th Cir. 1995).

In *NEC Electronics v. CAL Circuit Abco*, the Ninth Circuit addressed a gray market case with facts fully analogous to the facts in this case. *NEC Elecs. v. CAL Cir. Abco*, 810 F.2d 1506, (9th Cir. 1987), *cert. denied*, 484 U.S. 851 (1987). In *NEC*, the Japanese parent corporation (NEC Japan) assigned the distribution rights in the United States to its American subsidiary (NEC USA). *Id.* at 1507. The defendant, Abco bought NEC branded chips from NEC Japan, imported the NEC branded chips into the United States, and resold the NEC branded chips. *Id.* NEC USA then sued Abco for trademark infringement under the Lanham Act, citing Abco's gray market imports. *Id.* The Ninth Circuit stated that "because NEC–Japan and NEC–USA are

---

[2] The Supreme Court has recently expanded this "first sale" doctrine to patents and copyrights, expressly allowing the importation of patented and copyrighted goods by third parties. *See Impression Products, Inc. v. Lexmark Intern., Inc.*, 137 S. Ct. 1523, 1527 (2017) ("when a patentee sells an item under an express, otherwise lawful restriction, the patentee does not retain patent rights in that product"); *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 525 (2013) ("We hold that the 'first sale' doctrine applies to copies of a copyrighted work lawfully made abroad.").

commonly controlled, there is no danger to the latter in being unable to control the quality of the former's products. In this situation, we cannot say that Abco is selling goods of one make under the trade mark of another." *Id*. at 1510 (citation omitted). The Ninth Circuit concluded that:

> If NEC–Japan chooses to sell abroad at lower prices than those it could obtain for the identical product here, that is its business. In doing so, however, it cannot look to United States trademark law to insulate the American market or to vitiate the effects of international trade. This country's trademark law does not offer NEC–Japan a vehicle for establishing a worldwide discriminatory pricing scheme simply through the expedient of setting up an American subsidiary with nominal title to its mark.

*Id.* at 1511. The same must be said in this case.

## II.     THE COMPLAINT ALLEGES "CASE 2a" GRAY MARKET SALES BY DTI

The Complaint here alleges that DTI's gray market importation activities fall into "case 2a." Specifically, Hyundai alleges that:

> "[Hyundai International] is a Korean company, located in Seoul, Republic of Korea. [Hyundai International] manufactures and sells automobiles and automobile parts under the Hyundai brand. [Hyundai International] is the owner of certain trademarks associated with the Hyundai line of automobiles and automobile parts." [DE 1 at ¶9];

> "[Hyundai USA] is a subsidiary of [Hyundai International] and, since 1986, [Hyundai USA] has been the exclusive distributor in the United States of Hyundai motor vehicles and Genuine Hyundai Parts." [DE 1 at ¶15]; and

> "DTI is importing, promoting, offering for sale, advertising on the internet through its website (www.dti-parts.com) and through other media, and/or selling unauthorized Hyundai-branded parts, which were intended for sale abroad…." [DE 1 at ¶4].

In short, Hyundai International manufactures and sells automobile parts in many countries outside of the United States which are validly branded with its Hyundai trademarks. Hyundai USA is an American subsidiary of Hyundai International and has a license with Hyundai International to sell Hyundai parts in the United States which were made abroad *at Hyundai International's direction*. DTI legally purchases Hyundai branded parts, made abroad *at*

*Hyundai International's direction*, from the same source as Hyundai International and imports those parts into the United States for resale. In short, Hyundai has alleged a *prima facie* "case 2A" gray market import case where a single entity – Hyundai International – causes parts to be made, branded, and sold abroad with its marks. As was the case in *NEC*, here, Hyundai International has complete control over the *first sale* of its trademarked goods throughout the entire world including to both its US subsidiary and to any third party importer. The identical relationship in *NEC* and Hyundai are demonstrated in the graphic below:



However, in an attempt to control distribution in the United States, Hyundai does not allege that it has taken the legally appropriate steps suggested by Justice Brennan, namely: "(1) … not import[ing] directly to any domestic purchaser other than its affiliate; (2) …impos[ing] a restriction against resale (or against resale in the United States) as a condition on its sales abroad to potential parallel importers; or (3) … curtail[ing] sales abroad entirely." *K Mart*, 486 U.S. at 302. Nor does Hyundai International allege that it lacks control over the quality of goods branded with its Hyundai marks – it clearly has alleged such control. Instead, Hyundai has attempted an end run around US import laws by filing, *inter alia*, claims of trademark infringement and unfair competition against a legitimate "case 2a" importer. This is the exact case faced by the *NEC* court. As in *NEC* and *Sebastian*, "there is no actionable misrepresentation under the statute." 53

F.3d at 1076. The Lanham Act, *per se*, does not prevent gray market importation, especially where the foreign parent exercises control, as alleged by Hyundai in the Complaint.

## III.    FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

Fed. R. Civ. P. 12(b)(6) provides that a claim may be dismissed where a plaintiff  "fail[s] to state a claim upon which relief can be granted…." The Supreme Court has stated that in order to survive a motion under Rule 12(b)(6), the complaint must provide "enough facts to state a claim to relief that is plausible on its face." *Bell A. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

The Court will recognize that *Twombly* and *Iqbal* are routinely cited in motions to dismiss under Rule 12(b)(6). However, *Twombly* has particular application here since *Twombly* itself concerned antitrust allegations not completely unlike Hyundai's tortious interference allegations in this case. Describing *Twombly*, the *Iqbal* Court stated:

> The Court held the plaintiffs' complaint deficient under Rule 8. In doing so it first noted that the plaintiffs' assertion of an unlawful agreement was a "'legal conclusion'" and, as such, was not entitled to the assumption of truth. Had the Court simply credited the allegation of a conspiracy, the plaintiffs would have stated a claim for relief and been entitled to proceed perforce. The Court next addressed the "nub" of the plaintiffs' complaint—the well-pleaded, nonconclusory factual allegation of parallel behavior—to determine whether it gave rise to a "plausible suggestion of conspiracy." Acknowledging that parallel conduct was consistent with an unlawful agreement, the Court nevertheless concluded that it did not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior. Because the well-pleaded fact of parallel conduct, accepted as true, did not plausibly suggest an unlawful agreement, the Court held the plaintiffs' complaint must be dismissed.

*Iqbal*, 556 U.S. at 679–80 (internal citations omitted). Here, as in *Twombly*, accepting all allegations as true, at most Hyundai has alleged "lawful, unchoreographed free-market behavior" – the legal importation of gray market goods which were branded with Hyundai marks at the direction of Hyundai International. *Id*. Accordingly, all claims in the Complaint should be dismissed.

## IV.     ALL CLAIMS IN THE COMPLAINT MUST BE DISMISSED

### A.     <u>Hyundai has Failed to State a Claim for Trademark Infringement</u>

The Lanham Act defines trademark infringement as follows:

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; ….

15 U.S.C. §1114.

In the Fourth Circuit, there are four elements to trademark infringement:

To establish trademark infringement under the Lanham Act, a plaintiff must prove: (1) that it owns a valid mark; (2) that the defendant used the mark "in commerce" and without plaintiff's authorization; (3) that the defendant used the mark (or an imitation of it) "in connection with the sale, offering for sale, distribution, or advertising" of goods or services; and (4) that the defendant's use of the mark is likely to confuse consumers.

*Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 152 (4th Cir. 2012). Hyundai has failed to state a claim for trademark infringement under 15 U.S.C. §1114 for many reasons. Even when the facts as alleged in the Complaint are taken as true, Hyundai has failed to "plausibly" allege likelihood of confusion.

***First***, Hyundai fails to plausibly allege "that the defendant used the mark 'in commerce' ***and*** without plaintiff's authorization…." *Id*. (emphasis added). The Complaint's deficiency

regarding allegations of lack of *authorization* is fatal to the Complaint. As stated above, Hyundai has alleged in its Complaint that Hyundai International *authorized* the manufacture and sale of the accused Hyundai branded products abroad.[3]

> DTI has and continues to actively and knowingly import, distribute, advertise, promote, offer for sale, and/or sell in the United States replacement automotive parts bearing the HYUNDAI MARKS, which Hyundai did not intend for sale or use in the United States, but rather were intended for sale elsewhere….

[DE 1 at ¶ 49]. The fact that Hyundai International *authorized* the first sale of the replacement parts with its "HYUNDAI MARKS" and *intended* them for use in Hyundai automobiles is sufficient to defeat the claim. Whether or not Hyundai "intended" the goods for sale in the United States is of no consequence under the Lanham Act.

> [T]he right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product. Resale by the first purchaser of the original article under the producer's trademark is neither trademark infringement nor unfair competition.
> ***
> When a purchaser resells a trademarked article under the producer's trademark, and nothing more, there is no actionable misrepresentation under the statute.

*Sebastian*, 53 F.3d at 1073, 1074, 1076; *see also NEC*, 810 F.2d at 1510 ("Trademark law generally does not reach the sale of genuine goods bearing a true mark even though such sale is without the mark owner's consent."); *Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 107 (4th Cir. 1991) ("trademark law does not apply to the sale of genuine goods bearing a true mark, even if the sale is without the mark owner's consent").[4]

---

[3] Just as clearly, Hyundai does not allege that the accused parts are counterfeit or were manufactured and branded without Hyundai's authorization.

[4] In *Shell Oil*, the Fourth Circuit endorsed the holding of *NEC* but distinguished it on facts particular to *Shell Oil* because, unlike *NEC*, the *Shell Oil* defendant was *adding* the Shell trademarks to bulk oil sales and Shell did not have control over the *quality* of the oil *after* it left Shell's custody. In contrast, here as in *NEC*, Hyundai has not alleged that DTI is *adding* the trademark to anything (it does not); nor has Hyundai alleged that the *quality* of the auto parts deteriorates *after* it has left the custody of Hyundai International (it does not). Just as in *NEC*,

In short, Hyundai has not alleged that the first sale occurred without Hyundai's authorization – in fact, Hyundai has alleged the exact opposite – that Hyundai *authorized* the first sale. In this "case 2a" gray market case, Hyundai is without recourse. *K Mart*, 486 U.S. at 281. Gray market goods, especially those falling in "case 2a", are legally imported into the United States. Under controlling Supreme Court law and Fourth Circuit law, once Hyundai International exercised its authority in selling branded goods in commerce abroad, it and its American subsidiary lost any further legal control over the import of those goods into the United States.

To be clear, Hyundai does repeatedly say in the Complaint that the parts sold by DTI were "unauthorized". However, when Hyundai says "unauthorized", Hyundai is referring merely to the fact that the goods were sold by DTI, not Hyundai USA. In this way, Hyundai has applied a definition of "authorized" which is wholly inconsistent with that of the Lanham Act and the Supreme Court. The Supreme Court in *Twombly* accorded the term "conspiracy" as nothing more than unadorned legal conclusion and this Court should do the same with Hyundai's invocation of "unauthorized."

***Second***, as a further ground for dismissing the Claim, it is not plausible that DTI's customers do not know that they are buying imported Hyundai branded products. Accordingly, Hyundai has not plausibly alleged "that the defendant's use of the mark is likely to confuse consumers." In the Complaint, Hyundai includes screenshots from DTI's webpage which specifically disclaim any connection with Hyundai. *See* [DE 1 at 46 and 47]. One of the screen shots provides:

> DTI Inc. is an independent vendor of parts and does not represent any affiliation with any company, brand, or manufacturer. All parts carry a limited warranty provided by DTI Inc., subject to the terms and conditions of DTI Inc. No other

---

Hyundai has alleged that it has complete control over the *branding* of the replacement auto parts it makes and the *quality* of all of the parts to which it applies its trademarks.

> warranty (limited, implied or otherwise) by any company, brand, or manufacturer is implied or accorded by DTI Inc. on products carried or sold by DTI Inc.

*Id*. In view of this disclaimer, which is present in the four corners of Hyundai's Complaint, Hyundai has alleged that DTI's customers are informed of the gray market nature of the goods and cannot be confused. The Fifth Circuit, applying gray market laws to similar facts found the lack of potential for confusion to be critical: "The critical element that is missing from [plaintiff]'s argument and from the facts of this case, however, is the element of consumer confusion.… We decline to expand the reach of the Lanham Act in a way that makes [plaintiff]'s complaint actionable thereunder." *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc., of Lafayette*, 988 F.2d 587, 591 (5th Cir. 1993). This Court should do no different.

Further, Hyundai's allegations regarding its intentional interference with a contract claim also disavow any possibility of confusion. As discussed further below, Hyundai USA claims that DTI intentionally interfered with Hyundai USA's contract with the Hyundai dealers. According to Hyundai USA's allegations, Hyundai USA has an agreement which, *inter alia*, prevents the dealers from purchasing gray market parts and selling them to consumers without consent of the consumers. In paragraph 55, Hyundai alleges that DTI told Hyundai's dealer that it was aware of the dealer's "franchise agreement[.]" In a light favorable to Hyundai it must be the case that the gray-market nature of the parts is known to Hyundai's dealers.

Because the Complaint, accepted as true and read in a light most favorable to Hyundai, still results in the DTI's customers *not* being confused and fully aware of the gray market goods, there can be no likelihood of confusion which is a "critical" element. *Matrix Essentials*, 988 F.2d at 591; *Prestonettes*, 264 U.S. 359 ("When the mark is used in a way that does not deceive the public we see no such sanctity in the word as to prevent its being used to tell the truth. It is not taboo.").

Applying *Twombly*, "the 'nub' of the plaintiffs' complaint—the well-pleaded, nonconclusory factual allegation of [gray market] behavior— [does] not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior." *Iqbal*, 556 U.S. at 679–80. Hyundai's Complaint alleges nothing more than legitimate free-market behavior. For all of these reasons, Hyundai has failed to state a claim for trademark infringement under 15 U.S.C. §1114.

### B.     <u>Hyundai has failed to state a claim for False Designation of Origin</u>

The Lanham Act defines False Designation of Origin with respect to *confusion* as to origin as follows:

(a) Civil action

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
***
shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125 (a)(1)(A).

The False designation of origin portion of the Lanham Act was intended to capture infringement of unregistered trademarks, trade dress, and other actions which would promote consumer confusion as to "origin" of a product. The Supreme Court has discussed the term "origin" appearing in the statute and "conclude[d] that the phrase refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or

communication embodied in those goods." *Dastar Corp. v. Twentieth Cent. Fox Film Corp.*, 539 U.S. 23, 37 (2003).

Here, Hyundai does not allege that the "origin" of the goods was anyone other than Hyundai itself. In fact, Hyundai alleges exactly that – that Hyundai International *authorized* the manufacture and first sale of the goods. Because Hyundai alleges in its Complaint that Hyundai authorized the use of the HYUNDAI MARKS on the accused parts, for the same reasons stated above with respect to §1114, Hyundai has failed to state a claim for false designation of origin under 15 U.S.C. § 1125 (a)(1)(A).

### C.     Hyundai has failed to state a claim for False Designation of Origin

The Lanham Act defines False Designation of Origin with respect to *advertising* and promotion as follows:

> (a) Civil action
>
> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
> ***
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. §1125 (a)(1)(B). The Supreme Court has also recently analyzed the false advertising portion of the Lanham Act as follows:

> To invoke the Lanham Act's cause of action for false advertising, a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations.

*Lexmark Intern., Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1395 (2014). In

*Matrix Essentials*, the Fifth Circuit stated that:

> Affirmative misrepresentation, such as placing a plaintiff's trademark on the defendant's advertisements, is clearly a violation of section 1125(a). However, [plaintiff] is not able to point to any authority holding that the unauthorized stocking of a trademark owner's products, without more, rises to the level of a "misleading representation of fact."

988 F.2d at 593 (citation omitted).

Hyundai has failed to even allege, plausibly or otherwise, that DTI *misrepresented* the

nature of the products. It has not alleged that DTI uses the Hyundai marks in its advertising.

Indeed, Hyundai alleges the exact ***opposite*** – that DTI went out of its way to correctly represent

that these parts are gray market parts and that DTI is ***not*** affiliated with Hyundai. *See, e.g.*,

paragraphs 46 and 47 of the Complaint, where Hyundai alleges that DTI informs the customers

that:

> DTI Inc. is an independent vendor of parts and does not represent any affiliation with any company, brand, or manufacturer. All parts carry a limited warranty provided by DTI Inc., subject to the terms and conditions of DTI Inc. No other warranty (limited, implied or otherwise) by any company, brand, or manufacturer is implied or accorded by DTI Inc. on products carried or sold by DTI Inc.

By Hyundai's own pleading, DTI correctly informs the customers of the nature of the goods.

Hyundai has not alleged any misrepresentation whatsoever. Hyundai has failed to plausibly state

a claim for false designation of origin under 15 U.S.C. §1125 (a)(1)(B).

### D.   Hyundai has failed to state a claim for Dilution

The Lanham Act provides the following definition of trademark dilution:

(c) Dilution by blurring; dilution by tarnishment

(1) Injunctive relief
Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become

famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. §1125(c). The Fourth Circuit has defined the following elements of dilution under the Lanham Act:

(1) that the plaintiff owns a famous mark that is distinctive; (2) that the defendant has commenced using a mark in commerce that allegedly is diluting the famous mark; (3) that a similarity between the defendant's mark and the famous mark gives rise to an association between the marks; and (4) that the association is likely to impair the distinctiveness of the famous mark or likely to harm the reputation of the famous mark.

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 264–65 (4th Cir. 2007).

For the same reasons stated above, Hyundai has failed to state a claim for dilution because the import and sale of gray market parts, especially in the "case 2a" type of case identified by the *K Mart* court, is *per se* legal. In *K Mart*, the Supreme Court found that "case 2a" gray market cases were legal under US law because the parent company, Hyundai International here, had control over the source. The same is true here. Even if it is true that Hyundai International markets lesser quality parts outside the United States under its own Hyundai brand, Hyundai International has control over those parts as well. Hyundai International can improve the quality of those parts, or direct that their distributors not re-sell for American Import, or cease selling in those countries altogether. *K Mart*, 486 U.S. at 302 (Brennan, J., concurring). Hyundai International had all of those options at its disposal yet took none of these options. Instead, Hyundai International has attempted to shoe-horn a Lanham Act dilution claim into a set of facts where it has no application. This claim must fail. The Fourth, Fifth, and Ninth Circuits, among others, have clearly stated that merely reselling an imported, branded part incurs no liability under any "section[] of the Lanham Act...." *Matrix Essentials*, 988 F.2d at 593 (citing *NEC*, 810

F.2d at 1509); *cf. Shell Oil*, 928 F.2d at 107 (favorably citing *NEC* but distinguishing on unique facts).

Thus, Hyundai's dilution claim is fatally deficient for the same reasons as the trademark infringement claims. After Hyundai International authorized the manufacture and sale of its parts in commerce – the "first sale" – Hyundai International lost all control over downstream re-sales. "When a purchaser resells a trademarked article under the producer's trademark, and nothing more, there is no actionable misrepresentation under the statute [Lanham Act]." *Sebastian*, 53 F.3d at 1074, 1076. As in *Sebastian*, Hyundai has no action under the Lanham Act where DTI has merely resold a trademarked article and Hyundai has failed to state a claim.

### E.    Hyundai has failed to state a claim for Common Law Unfair Competition

The Fourth Circuit has stated that:

> The North Carolina common law of unfair competition in the context of trademarks and tradenames is similar to the federal law of trademark infringement. Unfair acts of a defendant are actionable when they damage a plaintiff's legitimate business. Such damages are suffered when a rival adopts for his own goods a sign or symbol in an apparent imitation of another's that would likely mislead prospective purchasers and the public as to the identity of the goods.

*Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987) (citing *Yellow Cab Co. v. Creasman*, 185 N.C. 551, 117 S.E. 787, 788 (1923) (other citations omitted). Because North Carolina common law unfair competition has the same elements as Lanham Act Causes of Action, Hyundai's pleading is deficient to the same extent as its Lanham Act claims above.

Further, the Fourth Circuit clearly stated: "damages are suffered when a ***rival adopts for his own goods*** a sign or symbol in an apparent imitation of another's…." *Id.* (emphasis added) Here, Hyundai has not alleged that DTI "adopts for [its] own goods" the HYUNDAI MARKS. Rather, Hyundai's Complaint is explicit that the parts sold by DTI are, in fact, parts authorized

and first sold by Hyundai International under its own trademark. Indeed, nowhere in the Complaint does Hyundai even allege that DTI makes or sells parts other than parts made by Hyundai International. Nor does Hyundai allege that DTI adds Hyundai's marks to anything – it clearly does not. For this reason also, Hyundai has failed to state a claim.

**F.** **Hyundai has failed to state a claim for Intentional Interference with Contractual Relations**

Intentional interference with contractual relations is a tort which exists at common law. In North Carolina – as in most common law states – the tort has the following elements:

> The tort of interference with contract has five elements: (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant *intentionally induces* the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*United Laboratories, Inc. v. Kuykendall*, 370 S.E.2d 375, 387 (N.C. 1988) (citing *Childress v. Abeles*, 240 N.C. 667, 84 S.E.2d 176 (1954)) (emphasis added).

Perhaps most significant among these elements is that, in addition to "knowledge" of the contract, the defendant must *intentionally induce* the third person not to perform the contract. Construing similar common law in Illinois, the Seventh Circuit explained that:

> [T]he element of "inducement" in the context of a claim for intentional interference with contractual relations requires more than the knowledge that one's conduct is substantially certain to result in one party breaking its contract with another.

*R.E. Davis Chem. Corp. v. Diasonics, Inc.*, 826 F.2d 678, 687 (7th Cir. 1987) (affirming dismissal of the complaint).[5] The Seventh Circuit further stated that:

---

[5] The elements of the Intentional Interference at issue in *R.E. Davis* closely parallel the elements in North Carolina at issue here. The elements under Illinois law are: "[1] a valid contract, [2] defendant's knowledge of the existence of the contract, [3] defendant's intentional and malicious inducement of the breach of the contract, [4] breach of the contract caused by defendant's

> The *mere failure* of a party to a contract to carry out its terms will not give rise to a cause of action *ex delicto* against it, to a third party who has contracted with the opposite party to such contract, although in breaching the contract such person may be charged with notice that the opposite party will not be able to perform its contract with such third party.

*Id*. (quoting *Wometco Theatres v. United Artists Corp*., 53 Ga.App. 509, 513-14 186 S.E. 572, 574-75 (1935) (emphasis in original); citing *New York Trust Co. v. Island Oil & Trans. Corp*., 34 F.2d 649, 652 (2d Cir. 1929) (L. Hand, J.); *In re Douglas Dunhill, Inc.*, 22 B.R. 953, 957 (Bankr.N.D.Ill. 1982); *Lamport v. 4175 Broadway*, 6 F.Supp. 923, 924 (S.D.N.Y.1934)).

Here, Hyundai alleges that:

> Hyundai enters into written agreements with its authorized Dealers in the United States, including the DSSA. Pursuant to the terms of the DSSA, if a Dealer sells or installs any part or accessory that is not a "Hyundai Genuine Part or Accessory," the Dealer must disclose that fact to the customer and advise the customer that the item is not included in the warranties furnished by HMA or HMC. The sales contract for any such Non-Genuine Hyundai Part must include written notice of such disclosure, and the Dealer must clearly explain to the customer the extent of any warranty covering the equipment, part, or accessories involved, and deliver a copy of the warranty to the customer at the time of sale. In addition, pursuant to the terms of the DSSA, the Dealer may not represent or offer to sell as "Hyundai Genuine Parts or Accessories," any parts or accessories which are not in fact "Hyundai Genuine Parts or Accessories."

[DE 1 at ¶ 42]. Further:

> The DSSA also provides that although the Dealer has a right to sell, install, or use products which are not "Hyundai Genuine Parts or Accessories," the Dealer shall, in those circumstances, utilize only such other parts and accessories that will not adversely affect the mechanical operation of the Hyundai Motor Vehicle being serviced or repaired, or are equivalent in quality and design to "Hyundai Genuine Parts or Accessories."

*Id*. at ¶43. Hyundai concludes: "Plaintiffs are informed and believe and thereon allege that DTI was and is aware of the DSSA, and through the acts alleged herein, intentionally interfered with Hyundai's contractual relationships with its Dealers." *Id*. at ¶44.

---

wrongful conduct and resultant [5] damage to the plaintiff." *R.E. Davis*, 826 F.2d at 685 (citing *Swager v. Couri*, 60 Ill.App.3d 192, 196, 376 N.E.2d 456, 459 (3d Dist.1978)).

The *R.E. Davis* case is particularly instructive. 826 F.2d at 687 (affirming dismissal of the complaint). In *R.E. Davis*, the district court dismissed the complaint for failure to state a claim and the dismissal was affirmed on appeal. The court in *R.E. Davis* seized on the fact that the plaintiff failed to allege **inducement** not to perform the contract.

Here, the Hyundai Complaint suffers the same defect. At most, in a light most favorable to Hyundai, Hyundai has alleged that DTI conveyed knowledge that a "franchise" agreement exists between Hyundai USA and the dealers.

> Hyundai is informed and believes and thereon alleges that, on or about September 28, 2017, the "New York Sales Representative" for DTI solicited via email the sale of the DTI Non-Genuine Hyundai Parts or illegal Hyundai grey-market parts to an authorized Hyundai Dealer in New Jersey. In that solicitation, DTI stated it was "the premier importer of NEW OEM parts for the Korean manufacturers." In that solicitation, DTI's representative further acknowledged that it was aware of the dealer's "franchise agreement" (i.e., the DSSA).

[DE 1 at ¶55]. This alleged knowledge of a "dealer's 'franchise agreement' (i.e., the DSSA)" is not enough to support **inducement** to breach the agreement. Further, Hyundai fails to allege knowledge of material terms of the agreement. As in *R.E. Davis*, Hyundai fails to move beyond mere legal conclusions. In fact, Hyundai alleges that even if its dealers buy from DTI, the purchase is not, in and of itself, a breach of the agreement between Hyundai USA and its dealers. According to the Complaint, in order for a breach to occur, the dealer would have to *not only* purchase from DTI, the dealer would *also* have to fail to inform its customers that the products were not sourced from Hyundai USA. [DE 1 at ¶ 42]. Simply put, there is no allegation, plausible or otherwise, in the Complaint that DTI *induced* Hyundai dealers to purchase products **and** also to fail to inform the dealers' customers. In sum, the Complaint is silent about any inducement. For these reasons, Hyundai has failed to state a claim for intentional interference with contractual relations.

### G. Hyundai has failed to state a claim under North Carolina Unfair and Deceptive Trade Practices Act NCGS §75-1.1

North Carolina Unfair and Deceptive Trade Practices Act is codified in §75-1.1 of the North Carolina General Statutes and provides in relevant part:

> (a)      Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.

Despite the broad nature of this statute, the North Carolina Courts have formulated the following elements:

> As construed by North Carolina courts, an unfair or deceptive trade practice act under N.C. Gen. Stat. § 75-1.1(a) has three elements: (1) an unfair or deceptive trade practice, (2) in or affecting commerce, and (3) proximately causing actual injury to plaintiff or plaintiff's business.

*Legacy Data Access, LLC v. MediQuant, Inc.*, 2017 WL 6001637, at *15 (W.D.N.C. Dec. 4, 2017) (citing *Furr v. Fonville Morisey Realty, Inc.*, 130 N.C. App. 541, 551, 503 S.E.2d 401, 408 (1998)). Further, "The determination of whether an act or practice is an unfair or deceptive practice that violates N.C.G.S. § 75-1.1 is a question of law for the court [not the jury]." *Legacy Data Access, LLC v. MediQuant, Inc.*, 2017 WL 6001637, at *16 (W.D.N.C. Dec. 4, 2017) (citing *Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000)).

Furthermore:

> Courts have determined that "North Carolina's Unfair and Deceptive Trade Practices Act ("UTPA") prohibits the same type of activity that the Lanham Act prohibits" because trademark infringement and false designation undercut the mark holder's goodwill and the consumers' ability to distinguish among products.

*Djarum v. Dhanraj Imports, Inc.*, 876 F. Supp. 2d 664, 668 (W.D.N.C. 2012) (quoting *Universal Furniture Int'l Inc. v. Collezione Europa USA, Inc.*, 2007 WL 2712926, at *15, (M.D.N.C.)).

Thus, claims under NCGS 75-1.1 often rise and fall along with parallel Lanham Act claims.

Because a claim under NC UDTPA rises and falls with Lanham Act claims, to the extent Hyundai has failed to state a claim under the Lanham Act, so to has Hyundai failed with respect to NC UDTPA. Further, the Supreme Court has stated that gray market goods are *per se* legal under US import laws in "case 2a" importations. *K Mart*, 486 U.S. at 286. "When the mark is used in a way that does not deceive the public we see no such sanctity in the word as to prevent its being used to tell the truth. It is not taboo." *Prestonettes*, 264 U.S. at 368. Justice Holmes' words remain true today. The Complaint clearly alleges that Hyundai International authorized the use of its brands on its own goods. DTI legally imported those goods under the laws of the United States as confirmed by the US Supreme Court in *K Mart*. Hyundai has not alleged any plausible case of likelihood of confusion, misrepresentation, false advertising, false designation of origin, or dilution. Hyundai has failed to plausibly allege anything that is unfair or deceptive. This case must be dismissed.

## V.     CONCLUSION

It is clear from the face of the Complaint that Hyundai is attempting the same course of conduct in which NEC sought to engage and was curtailed by the Ninth Circuit, namely, using United States trademark laws as "a vehicle for establishing a worldwide discriminatory pricing scheme…. *NEC*, 810 F.2d  at 1511. The Ninth Circuit forbade NEC from abusing the Lanham Act and this Court should do the same with respect to Hyundai.

For all of the above reasons, Hyundai International and Hyundai USA have failed to state a claim upon which relief can be granted. This matter should be dismissed with prejudice pursuant to Fed. R. Civ. P. 12(b)(6).

This the 8th day of March, 2018.

Respectfully submitted,

s/ Samuel A. Long, Jr.
W. Thad Adams, III (N.C. Bar No. 000020)
Samuel A. Long, Jr. (N.C. Bar No. 46588)
Kathryn A. Gromlovits (N.C. Bar No. 32700)
Christina Davidson Trimmer (N.C. Bar No. 44857)
SHUMAKER, LOOP & KENDRICK, LLP
101 South Tryon Street, Suite 2200
Charlotte, North Carolina 28280-0002
Tel:     (704) 375-0057
Fax:     (704) 332-1197
Email: tadams@slk-law.com
         along@slk-law.com
         kgromlovits@slk-law.com
         ctrimmer@slk-law.com

**CERTIFICATE OF SERVICE**

I hereby certify that on March 8, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically and electronically notify all counsel of record in this case.

s/ Samuel A. Long, Jr.
Samuel A. Long, Jr. (N.C. Bar No. 46588)
SHUMAKER, LOOP & KENDRICK, LLP
101 South Tryon Street, Suite 2200
Charlotte, NC  28280-0002
Tel:     (704) 375-0057
Fax:     (704) 332-1197
Email: along@slk-law.com